NOT RECOMMENDED FOR PUBLICATION
File Name: 13a0182n.06

No. 10-6479

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
**Feb 20, 2013**
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE EASTERN DISTRICT OF |
| DARRYL LAMONT DAVIS, | ) | TENNESSEE |
| | ) | |
| Defendant-Appellant. | ) | OPINION |
| | ) | |

Before: MARTIN and GILMAN, Circuit Judges; and Fowlkes, District Judge.[*]

**RONALD LEE GILMAN, Circuit Judge.** Darryl Davis appeals his conviction on multiple counts relating to armed robberies in the spring of 2007. For the reasons set forth below, we **AFFIRM** the judgment of the district court.

## I. BACKGROUND

The relevant facts are not in dispute. Davis was arrested in June 2007 pursuant to a federal complaint that charged him with bank robbery and interfering with interstate commerce through robbery. A federal grand jury later returned an eight-count indictment charging Davis with one count of bank robbery with a dangerous weapon, in violation of 18 U.S.C. § 2113(a), (d) (Count One), three counts of using a firearm during and in relation to a crime of violence, in violation of 18 U.S.C.

---

[*] The Honorable John T. Fowlkes, Jr., United States District Judge for the Western District of Tennessee, sitting by designation.

§ 924(c) (Counts Two, Four, and Six), two counts of obstruction of commerce by robbery, in violation of 18 U.S.C. § 1951 (Counts Three and Five), one count of being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1) (Count Seven), and one count of obstruction of justice by tampering with evidence, in violation of 18 U.S.C. § 1512(c) (Count Eight). Davis was convicted on all counts following a two-day jury trial in September 2009. The district court sentenced him in November 2010 to a total term of 762 months in prison. On appeal, Davis contends that (1) the district court erred in admitting evidence of his prior felony convictions, (2) his trial counsel was ineffective for failing to file a motion to suppress DNA evidence gathered from a warrantless swabbing of his inner cheek (called a "buccal swab"), and (3) the district court erred in finding him competent to stand trial.

## II. ANALYSIS

### A. Evidence of prior felony convictions

Davis first contends that the district court erred in denying his motion in limine requesting that the court "enter an order precluding the Government from offering any evidence with regard to the prior felony conviction." This contention is clearly without merit. Because being a felon is an element of a felon-in-possession offense, *see* 18 U.S.C. § 922(g), the government was required under Count Seven to prove that Davis had at least one prior felony conviction. The government accordingly offered, as it does in many cases, to stipulate to Davis's prior felony convictions without disclosing the nature of the felonies. But Davis declined the stipulation, electing instead to hold the government to its proof. This obliged the government to introduce a certified judgment of Davis's prior felony convictions (for attempted murder and automobile theft), as well as testimony limited

to the admission of the judgment. The government did not, however, introduce any evidence respecting the factual details of the prior felonies.

Having refused a stipulation that would have expedited the trial and benefitted him by not disclosing the nature of his prior felonious conduct, Davis has no cause to complain about the introduction of evidence proving that he was in fact a convicted felon. Davis has cited no authority that would limit the government's right to introduce such evidence as an element of the felon-in-possession charge. The authority he cites, *Old Chief v. United* States, 519 U.S. 172 (1997), simply held that when the defendant offered to stipulate to a prior felony conviction without specifying the name and nature of the offense, the government's decision to reject that offer and instead introduce evidence of the old conviction (for assault causing serious bodily injury) unfairly prejudiced the defendant. That is of course the opposite of what happened in the present case, where the stipulation was offered by the government and refused by Davis. The contention that the trial court erred by admitting evidence of Davis's prior felony convictions is therefore without merit.

Nor can we find any error in the district court's handling of such evidence. In admitting the evidence of Davis's prior convictions, the district court instructed the jury in the following words:

> Ladies and gentlemen of the jury, I am going to at this time give you a limiting instruction. You have heard testimony introduced by the government that the defendant has been previously convicted of two felony convictions; one for auto theft, one for attempted murder. You are instructed that this evidence is relevant only to Count 7 of the indictment charging violation of 18 United States Code § 922(g)(1), that is, being a convicted felon in possession of a firearm and is to be considered by you as relevant to no other count of the indictment for which the defendant is currently under indictment and is being tried.

Davis contends that this instruction "was not sufficient to address the prejudicial effect of the evidence" because "the court failed to instruct the jury about considering the evidence as it related to the character of [Davis]." But Davis did not object to the instruction at trial. And he did not—and, for that matter, still does not—offer an alternative instruction that he thinks would be preferable. We thus have no basis to doubt the adequacy of the instruction or the jury's ability to follow it. *See, e.g.*, *United States v. Cunningham*, 679 F.3d 355, 383 (6th Cir. 2012) ("'Juries are presumed to follow their instructions,' and the record provides no basis to believe that the jury here did otherwise.") (quoting *Richardson v. Marsh*, 481 U.S. 200, 211 (1987)) (brackets omitted).

## B. Ineffective assistance of counsel

Davis next claims that his trial counsel was ineffective because counsel failed to object to the introduction of DNA evidence obtained by a warrantless buccal swab. We decline to review this claim on direct appeal, however, because it is premature. *See United States v. Martinez*, 430 F.3d 317, 338 (6th Cir. 2005) ("As a general rule, a defendant may not raise ineffective assistance of counsel claims for the first time on direct appeal, since there has not been an opportunity to develop and include in the record evidence bearing on the merits of the allegations. This court has routinely concluded that such claims are best brought by a defendant in a post-conviction proceeding under 28 U.S.C. § 2255 so that the parties can develop an adequate record on this issue.") (internal citations and quotation marks omitted).

## C. Competency to stand trial

Finally, Davis claims that the district court erred when it found him competent to stand trial. "A criminal defendant is incompetent if he lacks 'sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding' or if he does not have 'a rational as well as

factual understanding of the proceedings against him.'" *United States v. Miller*, 531 F.3d 340, 348 (6th Cir. 2008) (quoting *Drope v. Missouri*, 420 U.S. 162, 172 (1975)). The "bar for incompetency is high," and "a defendant is not rendered incompetent to stand trial merely because he cannot get along with his counsel or disapproves of his attorney's performance." *Id.* at 350, 349. Because Davis's attack on the district court's finding of competency is predicated on an alleged error of fact rather than of law, we will review the finding under the clearly-erroneous standard. *See, e.g.*, *United States v. Ford*, 184 F.3d 566, 581 (6th Cir. 1999).

Davis's appellate counsel, who was not his trial counsel, claims, without describing any specific events or testimony, that Davis "refused to listen to counsel and sought to have counsel removed," "made rants about government conspiracies indicating his paranoia," and "was not able to assist at trial because he suffered from the delusion that his lawyer worked against him." Evaluating these allegations requires a review of the competency proceedings below.

In October 2007, pursuant to motions by both the government and Davis, the district court ordered a psychiatric evaluation of Davis. The evaluation was performed by Dr. Tanya L. Cunic, a forensic psychologist with the Bureau of Prisons. Dr. Cunic based her evaluation on observations, medical examinations, psychological tests, and interviews with Davis from late November 2007 through late January 2008, as well as her review of several documents and a telephonic interview with Davis's mother.

The forensic report issued by Dr. Cunic found that Davis "does not appear to suffer from any major mental illness," "his thinking was goal- and future-oriented," and he was "an essentially healthy male." Observations of Davis's interactions in the prison ward revealed that he "appeared to function adequately," was "polite" toward the staff, "maintained good hygiene and adequate

attention to personal appearance," and "was able to successfully negotiate a relatively large compound with minimal assistance from staff." Dr. Cunic found Davis's interactions during the interviews to be indicative of good memory and understanding, a "cooperative" attitude, the ability to "follow directions," and the ability to ask relevant and appropriate questions. "He denied symptoms associated with a mood or anxiety disorder" and "his behavioral presentation coincided with his assertion."

Dr. Cunic conducted one psychological test on Davis and attempted to conduct others, but Davis became resistant and refused further testing as the questions became more difficult. Davis's resistance to further testing stemmed from his belief that Dr. Cunic was attempting to "'revive' past problems he has since overcome." He was apparently referring to problems associated with an automobile accident in March 2003 that had resulted in "traumatic brain injury," including "generalized right side weakness, slowed speech, and memory deficits." All of these problems were "successfully rehabilitated" according to medical records and Davis's mother.

Dr. Cunic found that the limited psychological testing permitted by Davis did not provide sufficient information to "assess the exact nature of his strengths and potential deficits." Nevertheless, Dr. Cunic found, based on clinical observations and interviews, that Davis was fully functional, could "communicate fluidly with others and maintain activities of daily living without difficulty," and exhibited "no functional deficits in long- or short-term memory." Davis therefore did not "warrant[] a diagnosis that suggests he is experiencing a level of cognitive difficulty."

Dr. Cunic diagnosed Davis with "Antisocial Personality Disorder." This disorder, as described in the report, has nothing to do with a person's ability to understand the proceedings against him or to consult with counsel. Instead, a diagnosis of Antisocial Personality Disorder

-6-

indicates an individual's selfishness, arrogance or cockiness, "irritability and aggressiveness," propensity toward "deceitfulness or theft," "failure to conform to social norms with respect to lawful behaviors," "disregard [for] the wishes, rights, and feelings of others," and a willingness to deceive or manipulate others "in order to gain personal profit or pleasure."

Dr. Cunic also evaluated Davis's ability to understand and participate in the legal proceedings against him. She found that Davis "was able to correctly identify the multiple participants involved in legal proceedings," "had a good understanding of general legal procedures," and "displayed an ability to communicate adequately and to cooperate" with his counsel. These conclusions in the report were accompanied by specific questions and answers demonstrating that Davis had ample knowledge (for a layman) of what a criminal prosecution entails and what a criminal defendant's rights and options are. With respect to the assistance of counsel, Dr. Cunic found that Davis had "strong opinions" about how his attorney should represent him, but he "expressed respect and trust for his attorney's abilities."

Based on the foregoing, Dr. Cunic concluded that Davis "is not presently suffering from a mental disease or defect" and "is competent to proceed." She also concluded that Davis "will remain competent for the foreseeable future."

In an addendum to the forensic report, Dr. Cunic evaluated Davis's mental capacity at the time of the alleged offense. The addendum reviewed Davis's own recounting of his personal history, the circumstances surrounding the alleged crimes, and Dr. Cunic's observations and evaluations. Dr. Cunic concluded that Davis "did not have symptoms of a major mental illness or defect which would have precluded his ability to appreciate the nature and quality or wrongfulness of his actions."

In light of Dr. Cunic's report, counsel for Davis informed the district court that he did not intend to pursue an insanity defense at trial. The court subsequently entered an order in March 2008 finding that Davis was not insane at the time of the charged offenses and was competent to proceed to trial. There were no objections to the order. In July 2008, however, counsel for Davis filed a motion expressing concerns that Davis might be incompetent to proceed and requesting another psychological evaluation. The court granted the motion. This time, the evaluation was performed by Dr. Diana McCoy, a private clinical psychologist. Dr. McCoy primarily based her evaluation on a two-hour interview with Davis, but she also reviewed Dr. Cunic's report, certain medical records, the pretrial services report, and several letters written by Davis. She issued a forensic report that was filed with the court in December 2008.

Dr. McCoy's report confirmed that Davis was articulate, "alert," "adequately oriented to time, place, person, and date," and in possession of a good memory. The report also found that Davis understood the nature of the criminal proceedings against him, the options available to a criminal defendant, and the roles of various participants including the prosecutor, the defense attorney, the witnesses, the judge, and the jury. To this extent, Dr. McCoy's report was consistent with Dr. Cunic's.

But Dr. McCoy came to a different conclusion regarding Davis's competency to stand trial. Her different conclusion was based on Davis's notions about his legal defense and his perception of a conspiracy against him. Dr. McCoy reported that Davis "was preoccupied with a 21-page document" expounding the theory that "the United States government is bankrupt and therefore unable to prosecute him." According to this document, as recounted by Davis to Dr. McCoy, the federal government is "a legal fiction," and the entity that really "run[s] everything" is the "Uniform

Commercial Code." Davis also told Dr. McCoy that "there is a large scale conspiracy against him that includes his defense attorney, the prosecutor, U.S. marshals, and the Court." As "evidence" of this supposed conspiracy, Davis pointed to the warrantless buccal swab taken from him, the search of his car, the tapping of his prison phone, and a stipulation that his lawyer had asked him to sign. (The stipulation apparently related to Davis's prior felony convictions, discussed above in Part II.A.) Davis had refused to sign the stipulation because he believed that "the only way he can be legally prosecuted is if he signs it." "It means they can take you right into court under federal charges. They can skip right over the U.S. Bankruptcy issue. Signing the Stipulation means I'm waiving my rights."

When Dr. McCoy asked Davis about his statements to Dr. Cunic that he trusted his attorney, Davis responded that he used to trust the attorney but no longer did. Davis complained that "everything went downhill" once he showed his attorney the 21-page document about the Uniform Commercial Code. He insisted that "the jury needs to hear about the Uniform Commercial Code but that the judge is seeking to prevent this." Davis told Dr. McCoy that he is mentally sound and competent to stand trial, but he did not want to go to trial because the government has no authority to prosecute him and because he is the victim of a conspiracy. The report found that "although Mr. Davis has the ability to describe the roles of people in the courtroom and shows the capacity to behave appropriately in a courtroom setting, nonetheless he no longer is able to make rational choices, exercise good judgment, and consult with his attorney, who he now believes to be his enemy."

Based on the foregoing observations, Dr. McCoy diagnosed Davis with "Delusional Disorder, Persecutory Type." Dr. McCoy identified the "essential feature" of this disorder as "one or more non-bizarre delusions that persist for at least one month." She explained that a non-bizarre delusion,

as opposed to a bizarre one, is a delusion that "can conceivably occur in real life." Like Davis, people afflicted with Delusional Disorder appear normal in all respects when discussing subjects other than their conspiratorial delusions. The report concluded that Davis's condition had "deteriorated to a significant extent" since Dr. Cunic's evaluation and that Davis "is currently not competent to proceed with trial."

After receiving Dr. McCoy's report, the district court held a competency hearing in March 2009. Dr. McCoy testified first, recounting Davis's statements during the two-hour interview, as well as discussing letters written to her by Davis that expounded similar theories about the government's bankruptcy and a vast conspiracy and "fraud" perpetrated against him. She also read excerpts from letters written by Davis to his attorney requesting that damages of $365 million be sought for Davis's "unlawful arrest" and charging that the attorney had "taken a pay-off early on to sell [him] out." Dr. McCoy testified that she did not dispute the conclusion that Davis was competent to stand trial at the time of Dr. Cunic's initial evaluation, but she believed that Davis had become incompetent at some point after that evaluation, perhaps due to his placement in solitary confinement.

On cross-examination, the prosecutor asked Dr. McCoy whether she was aware that similar theories about government bankruptcy, vast conspiracies, and the Uniform Commercial Code had been espoused by many other criminal defendants. Dr. McCoy seemed to be unaware of the wide dissemination of these theories, but stated that such dissemination, even if true, would not affect her diagnosis.

After Dr. McCoy's testimony, the judge permitted Davis to address the court. Davis stated that he is fully competent, per Dr. Cunic's initial evaluation, and that his attorney "is trying to

enforce an incompetence on me" because Davis refused to sign certain stipulations. He also repeated his theories that the government is bankrupt, that his counsel was in cahoots with the prosecution to convict him, and that his counsel had been trying to get him to divulge incriminating information over the phone, which was being tapped, so as to gather evidence against him.

The next witness to be called was Dr. Cunic, who reiterated the findings in her report. When asked about Dr. McCoy's diagnosis of Delusional Disorder, Persecutory Type, Dr. Cunic testified that she "disagree[d] with her diagnosis." Dr. Cunic stated that Davis was apparently employing the so-called "Freeman defense." She testified that she was familiar with that defense based on her encounters with a number of other criminal defendants who "espoused the same philosophical ideas and defense strategy." Indeed, Dr. Cunic testified that out of the six to eight inmates that she had examined every month during the past year, approximately one inmate per month adopted the same Freeman strategy. Dr. Cunic accordingly stood by her initial determination that Davis was competent to stand trial.

After hearing from the witnesses, the district court noted that Dr. Cunic's initial finding of competency at the time of the first psychiatric evaluation still stood as unchallenged. But the judge was unsure as to whether Davis's condition had deteriorated in the year that had passed since the March 2008 competency hearing, particularly in view of the fact that there had not been a full mental evaluation of Davis in the interim. The court accordingly ordered another full evaluation in April 2009. For her second evaluation, Dr. Cunic observed and interviewed Davis over the course of a month and a half during May and June 2009, administered a number of tests, and reviewed several documents, including the documents considered by Dr. McCoy.

The findings in Dr. Cunic's second forensic report are fully consistent with those in her first report; i.e., that Davis "function[ed] appropriately," "maintained good hygiene and personal appearance," "did not display any bizarre behavior," had a good memory, demonstrated "no evidence of psychosis" or "paranoid behavior," "did not exhibit any persecutory, grandiose, or bizarre delusional ideas," was "able to follow directions and ask relevant questions," and was "cooperative." Indeed, he was even more cooperative than on the occasion of the first full evaluation in that he did not resist psychological testing and even apologized for his prior resistance.

Dr. Cunic determined, based on a Personality Assessment Inventory test, that Davis's "clinical profile does not reveal any significant psychopathology, but his profile does reveal difficulties in the area of inflated self-esteem, antisocial behavior, and cognitive rigidity." So even though Davis "is reluctant to admit minor short-comings and may view himself in an overly positive light," he "does not meet the diagnostic criteria for any psychotic disorder, mood disorder, anxiety disorder, or dissociative disorder." Dr. Cunic accordingly concluded that her original diagnosis of Antisocial Personality Disorder "remains unchanged."

Davis also took the Georgia Court Competency Test, which found, consistent with both Dr. Cunic's and Dr. McCoy's earlier evaluations, that Davis had a fully adequate understanding of both the charges pending against him and the process of criminal prosecution. Dr. Cunic's report then addressed Davis's relationship with his defense attorney. Davis believed that his attorney "has not effectively explained strategy to him or addressed pertinent legal issues," and he was especially critical of his attorney's failure to file a motion to suppress evidence. The report found it "likely that Mr. Davis and his attorney will have on-going conflict," but noted that the "conflict is not due to a severe mental disease or defect."

-12-

Dr. Cunic then specifically addressed Dr. McCoy's diagnosis of Delusional Disorder. She found that Davis's espousal of a conspiracy theory involving the Uniform Commercial Code and his refusal to trust any of the participants in the legal process, including his own attorney, was due to his Freeman defense strategy rather than to a psychological disorder. The report concluded that "the persecutory delusion to which Dr. McCoy refers is really the language of the 'freeman' groups. . . . Mr. Davis has not displayed elements of a severe mental disease or defect in the recent past; it would not be expected that he would exhibit a severe mental disease or defect in the foreseeable future." Dr. Cunic therefore opined that Davis "is competent to proceed" and "will remain competent for the foreseeable future."

The district court then conducted a third competency hearing in July 2009 following the issuance of Dr. Cunic's second report. At this hearing, the record reflects that "[d]efense counsel stated and the defendant agreed[] that the defendant was waiving a contested hearing and stipulating to the most recent Forensic Report." The court accordingly issued an order finding that Davis was competent to stand trial. Davis was tried and convicted in September 2009, and the issue of mental competency was not raised again until the present appeal.

Considering the foregoing proceedings, and having carefully reviewed all three forensic reports and the transcripts or records of all three competency hearings, we conclude that the district court did not err in finding Davis competent to stand trial. Far from showing any evidence of clear error, the district court's approach to the competency issue was cautious and deliberate. Dr. Cunic's conclusions, based on two thorough evaluations, are not assailed in any meaningful detail on appeal and were unchallenged below. The only indication of incompetency was found in Dr. McCoy's diagnosis of Delusional Disorder, Persecutory Type, based primarily on a single two-hour

-13-

examination. This diagnosis was rejected in Dr. Cunic's second report, a rejection that was not contested by Davis either personally or through counsel. We find Dr. Cunic's rebuttal of Dr. McCoy's diagnosis entirely persuasive, and we note that the mere fact that a criminal defendant espouses a far-fetched, or even bizarre, legal-defense theory is insufficient to clear the high hurdle for incompetency that has been set by the prior decisions of the Supreme Court and this circuit. *See generally United States v. Miller*, 531 F.3d 340, 348-50 (6th Cir. 2008) (discussing the standard for incompetency, as established by the Supreme Court, and holding that the district court did not err in failing to hold a competency hearing).

## III. CONCLUSION

For all of the reasons set forth above, we **AFFIRM** judgment of the district court.