NOT RECOMMENDED FOR PUBLICATION
File Name: 23a0016n.06

Case No. 21-1498

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | **FILED** Jan 09, 2023 DEBORAH S. HUNT, Clerk |
| Plaintiff-Appellee, | ) |  |
|  | ) |  |
| v. | ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN |
|  | ) |  |
| JUAN OLAYA, | ) |  |
| Defendant-Appellant. | ) |  |
|  | ) | OPINION |

Before: SUTTON, Chief Judge; KETHLEDGE and LARSEN, Circuit Judges.

SUTTON, Chief Judge. Juan Olaya robbed fourteen families across four States. A jury convicted him on racketeering and firearm charges, and the district court sentenced him to forty years in prison. Olaya claims on appeal that he was not competent at his trial or sentencing and that his indictment failed to state some of the charges against him. We affirm.

I.

For nine months in 2014, Olaya led a three-to-four person "robbery crew." R.509 at 10. Criss-crossing the nation, the crew held up more than a dozen families at gunpoint, usually targeting Asian and South-Asian families. A federal grand jury indicted Olaya for racketeering conspiracy, assault with a dangerous weapon in aid of racketeering, and use of a firearm during a crime of violence.

Olaya suffers from delusions. In his view, the government prosecuted him to retaliate for his refusal to go along with a plan to "cover up" terrorist plots. R.282 at 5. He says that he possesses "secret information" about these plots, that he foiled terrorist attacks in the past, and that God chose him to protect "America from terrorists." App'x at 3, 15. Olaya has shared these beliefs with the district court in this case, and with the Federal Bureau of Investigation and the U.S. Attorney General, among others.

Noticing these delusions, Olaya's defense attorneys sought a competency hearing before trial. They informed the district court that Olaya fixated on terrorist activity and government persecution. Two psychologists concluded that Olaya's delusions impaired his "rational appreciation of his case" and made him distrustful of his attorneys. R.296 at 10. After a hearing, the court agreed and committed Olaya to federal custody for treatment.

Ten months later, Olaya returned to court. This time, his attorneys opined that Olaya "[had] been able to discuss his case, answer questions, and remain focused." R.366 at 2. A third forensic psychologist concurred. She warned that Olaya had refused to discuss his terrorism-related beliefs with her—those issues, he said, were "too big for [her] to understand" and may lead her to think him unwell. App'x at 27. But she added that Olaya reviewed the discovery, understood his trial strategy, and promised to "afford his attorneys' advice significant weight." *Id.* at 31. "Despite likely maintaining delusional beliefs," she concluded, Olaya's beliefs "did not interfere with his ability to engage with" his attorneys "in a rational and focused manner." *Id.* at 31–32. Drawing on months of monitoring and multiple interviews, she deemed him competent.

After considering all of this evidence, the district court found Olaya competent and proceeded to trial. At trial, Olaya regularly conferred with his attorneys (and occasionally complained to the district court about their trial tactics). The jury convicted him on all charges.

After his conviction, Olaya fired his trial attorneys and sought new counsel. The district court granted the motion, but Olaya could not get along with his new sentencing attorney either, who described Olaya as "one of [his] worst clients" in three decades. R.528 at 7. But the new attorney still submitted a thorough sentencing memorandum on Olaya's behalf. He also told the court that he initially "got along pretty good" with Olaya and that disagreements arose only after he completed the memorandum. *Id.* at 8.

At sentencing, Olaya addressed the court. He began with his life story, describing his Colombian mother—who died of cancer—and American daughter. He apologized to the victims and admitted mistakes, yet he maintained that "what they're accusing me of . . . it doesn't exist." *Id.* at 78. He also returned to his conspiracy theories, saying that he had "saved" the nation "from a terrorist attack" and that his attorneys were "protecting terrorists." *Id.* at 70, 75. His closing asked for leniency, calling the trial judge "a woman of good heart" and saying he "deserve[d] an opportunity in life." *Id.* at 78.

The district court sentenced Olaya to forty years in prison.

## II.

On appeal, Olaya principally claims that the district court should not have found him competent for trial and sentencing.

While incompetent, an individual cannot face criminal process. 18 U.S.C. § 4241(d); *Indiana v. Edwards*, 554 U.S. 164, 170 (2008). That's because an incompetent person cannot "make his defense." 4 William Blackstone, *Commentaries* \*24.

Incompetence, however, does not mean eccentricity, and it is not invariably a permanent condition. To be incompetent, a defendant must be "unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense." 18 U.S.C.

3

§ 4241(d); *Dusky v. United States*, 362 U.S. 402, 402 (1960) (per curiam). That bar is a formidable one. *United States v. Tucci-Jarraf*, 939 F.3d 790, 795 (6th Cir. 2019). Mental incompetence amounts to a "deep[] breakdown" in cognition, which requires more than bizarre, delusional, or "baffling" beliefs. *Id.* at 795–97.

A district court must examine competency, at the behest of the parties or on its own, if "reasonable cause" exists to do so. 18 U.S.C. § 4241(a). Because a district court's competency ruling is fact intensive, we give it considerable deference. *Tucci-Jarraf*, 939 F.3d at 796.

*Trial.* Ample evidence showed that Olaya could stand trial. His own lawyers said as much, as did the only psychologist to examine Olaya after his committal. That unanimity alone renders it "difficult to find" incompetency on this record. *United States v. Denkins*, 367 F.3d 537, 546–48 (6th Cir. 2004). Rendering it more difficult still, the district court, with its years of experience overseeing Olaya's case, thought so too.

Many sources bolstered these conclusions. The evidence from Olaya's lawyer and examining psychologist suggested that Olaya was competent. Olaya collaborated with his lawyers to formulate trial strategy. And he "demonstrated an intact factual understanding" of his case and of potential defenses when the psychologist examined him. App'x at 31. This behavior suggested that Olaya could understand the proceedings and aid his defense. 18 U.S.C. § 4241(d); *United States v. Patterson*, 828 F. App'x 311, 313–14 (6th Cir. 2020) (finding competence when defendant could identify the charge, potential sentences, and the "various players in the process," and provided "well-reasoned" answers to a psychologist's questions).

Olaya counters that he harbored delusions during the trial. But delusions alone do not render a defendant incompetent, so long as he can understand the proceedings and assist in his defense. *Denkins*, 367 F.3d at 547–48; *Tucci-Jarraf*, 939 F.3d at 796. In trying to bolster this

argument, Olaya cites two district court decisions. *See United States v. Franklin*, No. 7:19-mj-2, 2020 WL 748181, at *4 (E.D. Ky. Feb. 14, 2020); *United States v. Krueger*, No. 1:13-cr-561, 2017 WL 2349600, at *1 (N.D. Ohio May 31, 2017). Not only do such decisions not bind us, but they are not applicable on their own terms. They involved defendants whose "pervasive delusions" infected their relationships with counsel and their decisions about their cases. *Franklin*, 2020 WL 748181, at *4. Olaya has not demonstrated that his delusions interfered with his trial preparation in an equivalent manner.

Olaya objects that the district court did not explicitly compare the first two psychologists' reports (which found him incompetent) to the third report (which found him competent). It did not need to. Olaya's first two psychologists examined him before his committal for months of treatment, whereas the third psychologist examined him afterwards. The district court reasonably inferred that Olaya improved in the interval. *See United States v. Willis*, 362 F. App'x 531, 532–34 (6th Cir. 2010).

Olaya protests that the court did not provide the evidentiary hearing described in 18 U.S.C. § 4241 and § 4247(d). Not so. Olaya received "an opportunity to testify," present evidence, and question witnesses at his renewed competency hearing, as § 4247(d) requires. Olaya simply opted not to take advantage of those opportunities. Olaya's lawyers and the psychologist who examined him before the hearing all agreed that Olaya was competent. "The district court did not abuse its discretion by choosing not to inquire further into [Olaya's] competency than it already had." *United States v. Heard*, 762 F.3d 538, 542 (6th Cir. 2014).

Olaya insists that the court should have asked him open-ended questions at the hearing to assess his delusions. While the court might well have done so, it was not unreasonable to rely on the assessments of Olaya's lawyers and a psychologist. We have upheld competency

5

determinations before in which the district courts did not question the defendants. *United States v. Davis*, 515 F. App'x 486, 493 (6th Cir. 2013); *Willis*, 362 F. App'x at 533–35.

Olaya intimates that, even if he *was* competent at his second competency hearing, he could have deteriorated later. "Where, however, a trial court has already held a competency hearing and deemed the defendant competent, it need not reevaluate its determination unless presented with qualitatively different evidence." *Carter v. Bogan*, 900 F.3d 754, 769 (6th Cir. 2018). Olaya points to no such evidence.

*Sentencing.* Olaya's allocution at sentencing, even though rambling at times, did not create "reasonable cause" to doubt his competence either, or at least the district court did not reversibly err in thinking so. 18 U.S.C. § 4241(a). Many of Olaya's statements suggested competence. He began by inviting sympathy. He told the court of his mother's death and his hope to see her grave. He apologized to the court and to his victims. He explained that he "always like[d] to help" others. R.528 at 73. And he closed by asking the court "to be reasonable" and to not "see the bad so much." *Id.* at 72, 77. All of this made it reasonable for the court to think that Olaya could "understand the nature and consequences of the proceedings against him"—a sentencing hearing in which his prison term depended on the court's mercy—and "assist properly in his defense." 18 U.S.C. § 4241(a), (d).

No less importantly, the circumstances surrounding Olaya's sentencing hearing indicated competence. Olaya's presentence report did not flag competence issues. His attorney did not put competence at issue before the district court either. True, that attorney later moved to withdraw, claiming that Olaya became "angry and uncooperative" after discovering that his sentencing memorandum discussed mental-health challenges. R.528 at 8. But the attorney emphasized that

he "got along pretty good" with Olaya beforehand, and he explained that the recent tensions did not affect the sentencing memorandum. *Id.*

That leaves Olaya's decision to allocute, at length, about the terrorist plots he had foiled and the shifting conspiracies against him. Olaya's renewed focus on his delusions does not require reversal. The court was already aware that Olaya had delusions but had reasonably found, based on Olaya's attorneys' reports and on the psychologist's findings, that those delusions did not impair Olaya's competence. Olaya's allocution, viewed through this lens, was not the kind of "qualitatively different evidence" that compelled reconsideration. *See Bogan*, 900 F.3d at 769.

*United States v. Harlan* confirms the point. 480 F.2d 515 (6th Cir. 1973). In *Harlan*, as in this case, the district court found a defendant with pre-existing psychiatric problems competent for trial. *Id.* at 516. Then, as in this case, the defendant made troubling statements at sentencing, indicating "he had a mission to save the world and a right to destroy people in authority." *Id.* at 517. We held, as we do in this case, that his allocution did not give the court sufficient "notice of a possible change in [the defendant's] condition." *Id.*; *see Willis*, 362 F. App'x at 535 (same).

Olaya faults the court's suggestion at sentencing that his delusions might have arisen from his "aware[ness] of what [he] did and the consequences." R.528 at 79. But the court also acknowledged that Olaya had a disorder and needed treatment. These remarks at any rate do not show that the court misunderstood or ignored the competency standard. *See United States v. Miller*, 531 F.3d 340, 348–50 (6th Cir. 2008).

Olaya submits that his incompetence was obvious based on his rambling and unpersuasive allocution. But Olaya is not the first defendant to offer, at least at times, a less-than-helpful allocution. *See, e.g.*, *Harlan*, 480 F.2d at 516–17. In the full context of the case, Olaya's allocution did not create reasonable cause for finding him incompetent.

III.

Separate from his claims of incompetence, Olaya argues that Count Seven and Count Nine of the indictment are deficient because they do not expressly allege that Olaya or a conspirator brandished a firearm.

An indictment is sufficient if it charges the elements of the offense and "fairly informs a defendant of the charge." *Hamling v. United States*, 418 U.S. 87, 117 (1974). We read an indictment as a whole, keep an eye on function over form, and consider whether it put the defendant on notice of the charges. *United States v. Howard*, 947 F.3d 936, 942 (6th Cir. 2020); Fed. R. Crim. P. 7(c)(1). Courts look past errors in an indictment unless the defendant shows prejudice to his defense at trial, to his trial's fairness, or to his ability to bar subsequent prosecutions. *United States v. Rankin*, 929 F.3d 399, 404 (6th Cir. 2019).

The grand jury indicted Olaya for using or carrying a firearm during four robberies in violation of 18 U.S.C. § 924(c)(1)(A). Each Count—numbers Three, Five, Seven, and Nine—carried a mandatory minimum sentence of five years, which increased to seven years if a firearm was "brandished." *Id.* § 924(c)(1)(A). At trial, the jury convicted Olaya on each Count and found that Olaya or a conspirator brandished a gun during the robberies. Relying on those findings, the district court sentenced Olaya to seven years for each of the four Counts. Because brandishing a firearm increases the mandatory minimum sentence, it is an element of the offense that must be charged in the indictment. *Alleyne v. United States*, 570 U.S. 99, 115–16 (2013).

Olaya claims that Counts Seven and Nine do not include a brandishing element. Not true. Count One alleges that Olaya and his crew "openly carried and brandished firearms in each of the robberies." R.96 at 3. Those robberies include the two at issue in Counts Seven and Nine. Now look at Counts Seven and Nine. They do not use the word "brandish" to describe the robberies,

granted. They instead incorporate the allegation from Count One that the crew "brandished firearms in each of the robberies." *Id.* at 3. Saying the "firearm was brandished," as Counts Three and Five do, would make easier reading, granted again. *Id.* at 29–31. But incorporating these allegations by reference passes muster. *See* Fed. R. Crim. P. 7(c)(1); *United States v. Salisbury*, 983 F.2d 1369, 1374 (6th Cir. 1993) (looking to incorporated allegations to evaluate sufficiency); *see also United States v. Johnson*, 899 F.3d 191, 199 (3d Cir. 2018) (incorporating brandishing element from a prior count was permitted); *United States v. Hector*, 611 F. App'x 632, 641 (11th Cir. 2015) (per curiam) (same).

Even if Counts Seven and Nine had failed to allege brandishing—they did not—any error would be harmless. Olaya has not proven, or even alleged, prejudice to his defense or to the fairness of trial. That failure dooms his claim. *See United States v. Cor-Bon Custom Bullet Co.*, 287 F.3d 576, 580 (6th Cir. 2002).

On top of that, prejudice is difficult to imagine on this record. Even without incorporation, the indictment dispels any mystery about the key facts. Count One alleged that Olaya and his crew robbed more than a dozen homes, brandishing firearms each time. For the robberies in Counts Seven and Nine, Count One specifies that Olaya and his associates "held victims C-1 and C-2 at gunpoint," and later "forced Family D at gunpoint into the basement where they [were] bound." R.96 at 18–19. That conduct readily fits § 924(c)'s definition of brandish: displaying a firearm or using it to intimidate. 18 U.S.C. § 924(c)(4). Well before trial, moreover, the jury instructions made clear that brandishing was at issue. Added up, Olaya knew the "specific affirmative acts [he] was accused of committing" and he had every opportunity to pursue a defense. *Cor-Bon*, 287 F.3d at 580; *see United States v. Hudson*, 491 F.3d 590, 593–94 (6th Cir. 2007) (though not

incorporated into later counts, allegation that fact existed at "all times material to this indictment" put defendant on notice).

Olaya interjects that Counts Three and Five incorporate the brandishing allegation from Count One *and* assert the "firearm was brandished." R.96 at 29–31. Counts Seven and Nine, meanwhile, include only the first half of this language. But a single reference to brandishing suffices, whatever the occasional rewards of belt-and-suspenders language. A contrary approach would turn every precautionary redundancy in one place into a mandatory one in later places. No precedent, at least not one cited by Olaya, requires us to read indictments in this unforgiving way.

Olaya insists that he lacked notice that the increased penalty for brandishing would apply. The record shows otherwise. Six years before trial, Olaya and his counsel acknowledged that Counts Three, Five, Seven, and Nine all carried a minimum of seven years in prison, a statement that could be true only if each Count charged brandishing. 18 U.S.C. § 924(c)(1)(A). Nothing changed by the time of the final pretrial conference. When the government offered to drop one of the § 924(c)(1)(A) charges in exchange for a plea, the court asked if a "consecutive 21" years would apply to the three remaining Counts. R.529 at 11. The government agreed—seven years for each. Olaya's counsel did not distinguish Counts Three and Five from Counts Seven and Nine. And neither he nor Olaya contested the figures. By all appearances, the indictment did its job— "enable[] the defendant to predict the legally applicable penalty." *Alleyne*, 570 U.S. at 113.

We affirm.