RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 14a0212p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

GREGORY ESPARZA,

        *Petitioner-Appellant,*

    *v.*

ED SHELDON, Warden,

        *Respondent-Appellee.*

No. 13-3358

Appeal from the United States District Court
for the Northern District of Ohio at Toledo.
No. 3:96-cv-07434—Christopher A. Boyko, District Judge.

Argued: July 30, 2014

Decided and Filed: August 28, 2014

Before: SILER, SUTTON and KETHLEDGE, Circuit Judges.

---

## COUNSEL

**ARGUED:** Lori B. Riga, OFFICE OF THE FEDERAL PUBLIC DEFENDER/CAPITAL HABEAS UNIT, Cleveland, Ohio, for Appellant. Ashon L. McKenzie, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee. **ON BRIEF:** Lori B. Riga, Alan C. Rossman, Vicki Ruth Adams Werneke, OFFICE OF THE FEDERAL PUBLIC DEFENDER/CAPITAL HABEAS UNIT, Cleveland, Ohio, Jeffry F. Kelleher, JEFFRY F. KELLEHER & ASSOCIATES, CO., Cleveland, Ohio, for Appellant. Ashon L. McKenzie, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee.

1

———————————

**OPINION**

———————————

SUTTON, Circuit Judge.   Three decades ago, Gregory Esparza murdered Melanie Gerschultz for just over a hundred dollars in cash.  An Ohio jury sentenced him to death.  After the Ohio state courts refused to alter his sentence, Esparza unsuccessfully sought habeas relief in federal district court.  Because the Ohio courts reasonably rejected his claims, we affirm.

I.

On February 12, 1983, Melanie Gerschultz and James Barailloux were working the night shift at a Toledo restaurant when Gregory Esparza walked inside.  Wearing a ski mask and brandishing a gun, he ordered someone to open the register.  Melanie complied, but James escaped through the back door and found help.  When he returned, Esparza had fled, $110 was missing from the register's cash drawer, and Melanie lay dying on the floor from a bullet wound in her neck.

In October 1983, an Ohio grand jury indicted Esparza on one count of aggravated robbery and one count of aggravated murder with a capital specification.  The trial court appointed Thomas Stebbins and Norman Zemmelman as Esparza's lawyers and scheduled trial for January 23, 1984.  When his lawyers asked for more time to interview potential witnesses, the court delayed the trial until March 5.  And when both of them withdrew—Zemmelman citing a conflict of interest, Stebbins a dearth of experience—the court again delayed the trial until replacement counsel could familiarize themselves with the case.  Jury selection eventually started on April 30, 1984, and opening arguments began four days later.  After hearing that Esparza had confessed to a fellow inmate and to one of his siblings, among other evidence, the jury convicted on both counts.

In connection with the penalty phase of the trial, Esparza's lawyers moved for an "independent expert at state expense."  J.A. 270.  They invoked two state statutes:  Ohio Rev. Code § 2929.024, which provides independent expert services to indigent defendants, and Ohio Rev. Code § 2929.03(D)(1), which provides court-appointed expert services to capital

defendants. The court denied the first request but granted the second, appointing the Court Diagnostic and Treatment Center. Upon reading the Center's report and finding it wanting, Esparza's lawyers asked the court to undo their § 2929.03 request, to keep its results from the jury, to appoint an independent expert, and to grant a continuance of unspecified duration. The court granted a one-day continuance to permit argument over the motion but ultimately denied all four requests.

During the penalty phase, Esparza's lawyers focused the jury's attention on his troubled youth. Esparza's grandfather, Richard DeLa Rosa, testified that Esparza's father Frank deserted his mother Beatrice and "all the[ir eight] kids" when Esparza was young. J.A. 7450. Beatrice started "going out again" shortly afterwards, often abandoning her children and leaving them in her ten-year-old daughter's care. *Id.* at 7453. The family "didn't have no food," "money," or "shoes to go to school," and the children were sometimes sent home "because their hair was full of lice." *Id.* at 7450. Eventually, the police "load[ed] the whole bunch" into a "paddy wagon" and placed them in a Children's Home. *Id.* at 7454. DeLa Rosa took in most of Beatrice's children, but he left Esparza behind.

Esparza's aunt, Virginia Gonzales, testified that Beatrice died when Esparza was young. She reported that Frank would whip Esparza with a wire hanger and would force his children to sit outside in a bitterly cold hallway when he wanted to be alone.

Esparza's brother Peter testified that, as children, the two of them would steal food from a corner store because "[t]here wasn't nothing to eat in the house." *Id.* at 7473. Frank came home drunk "all the time" and "smack[ed] [the children] around." *Id.* at 7474. Making matters worse, Esparza "never really got too much attention with the family," as evinced by the fact that DeLa Rosa "left him in the Children's Home" but took care of the others. *Id.* at 7477. Esparza's grandmother doted on Peter but ignored Esparza himself. Bounced from foster home to foster home, Esparza had trouble keeping in touch with his relatives.

Finally, Ralph Grennay, one of Esparza's foster fathers, testified that he "enjoyed" Esparza's company and that Esparza "got along fine" with his family. *Id.* at 7494. Under his tutelage, Esparza improved his grades, joined the Boy Scouts and a Youth for Christ church group, and played middle school football. After two years, however, Esparza's counselors,

psychiatrists and psychologists recommended—against Grennay's wishes—that Esparza begin visiting his blood relatives more frequently. *Id.* at 7505. Grennay feared, with some foresight, that removing Esparza would "take away everything we tried to work with him for." *Id.* at 7510.

To bolster their mitigation theory, Esparza's lawyers also introduced more than two hundred pages of records depicting his childhood in horrific terms. This "Family File" contained psychological evaluations, his juvenile record and summaries of his troubled social history. One entry reported that, when Esparza was two or three, "one of his brothers poured Drano on the other children and they were all burned over their bodies." R. 193-1 at 4. When he was five, he "got his hand caught in a car" and was "dragged by his knees." *Id.* A second entry set forth the verbal and physical abuse, financial difficulties and pending divorce action that culminated in a "[c]omplete family breakdown . . . in the early 1970's." R. 185-1 at 21. A third entry explained why Esparza ended up in the Grennays' care. On a routine home visit, a social worker discovered Esparza bleeding from the nose; his step-mother had beat him after an argument. A fourth entry connected Esparza's "deep-seated feelings of rejection" to his pattern of "delinquent activity," which it described as a "means of achieving peer acceptance." R. 193-1 at 33.

Despite his lawyers' efforts, the jury sentenced Esparza to death, and the trial court accepted its recommendation. The Ohio Court of Appeals and the Ohio Supreme Court affirmed that sentence on direct appeal. When his attempts to secure state post-conviction relief failed, Esparza filed a habeas petition in federal district court in 1996.

The district court found four of Esparza's fifty-six claims to be well-taken: (1) a defective indictment, (2) ineffective assistance of counsel at the penalty phase, (3) an improper denial of a continuance request, and (4) cumulative error. We affirmed on the first ground without reaching the others. *Esparza v. Mitchell*, 310 F.3d 414, 422 (6th Cir. 2002). But the Supreme Court reversed the decision. *Mitchell v. Esparza*, 540 U.S. 12 (2003) (per curiam). On remand, the district court reconsidered and then rejected Esparza's remaining grounds for relief, *see Esparza v. Anderson*, 2012 WL 2872149 (N.D. Ohio July 12, 2012), *amended by* 2013 WL 774155 (N.D. Ohio Feb. 27, 2013), and granted him a certificate of appealability on the ineffective-assistance and continuance claims, *id.* at *54.

II.

Two sets of rules govern Esparza's claim that his lawyers provided constitutionally ineffective assistance of counsel at the penalty phase of his trial. The first: He must establish the prerequisites of an ineffective-assistance claim—that his lawyers provided deficient counsel and that this defective representation prejudiced the outcome of the penalty-phase proceedings. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). The second: He must surmount the Antiterrorism and Effective Death Penalty Act (AEDPA), which bars us from overriding a state court's ruling on the merits unless it unreasonably applied Supreme Court precedent. 28 U.S.C. § 2254(d). Through it all, he must establish that the state courts unreasonably departed from Supreme Court precedent based on the record they had before them. *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011). New evidence developed during federal habeas proceedings, generally speaking, is off limits. *See Moore v. Mitchell*, 708 F.3d 760, 784 & n.11 (6th Cir. 2013). Esparza cannot meet these requirements.

Reduced to its essence, Esparza's theory is that his lawyers developed too much bad evidence at the penalty phase of his trial and not enough good. We need not decide whether "there is any reasonable argument that [Esparza's] counsel satisfied *Strickland*'s deferential standard" of performance, *Harrington v. Richter*, 131 S. Ct. 770, 788 (2011), or indeed whether Esparza has accurately described his lawyers' conduct. The Ohio courts rejected all of his ineffective-assistance arguments for lack of prejudice. Because their decisions were not unreasonable, we must do the same.

A.

Esparza blames trial counsel for not preparing for the penalty phase until a "mere five days before [it] actually began." Appellant Br. at 46. True or not, this allegation did not lead to an investigation that produced little or no mitigation evidence. *E.g.*, *Wiggins v. Smith*, 539 U.S. 510, 515–16 (2003). His lawyers put on four witnesses who described Esparza's youth in graphic detail. They also introduced more than two hundred pages of records that reinforced this theory of leniency. On direct appeal, the Ohio Supreme Court described those records as Esparza's "most persuasive argument against . . . the death penalty." *State v. Esparza*, 529 N.E.2d 192, 199 (Ohio 1988). The trial judge's sentencing opinion underlines the force of

counsel's presentation. It highlighted the "lamentable conditions [Esparza] endured throughout his babyhood, childhood and adolescence" and referenced specific incidents discussed by defense witnesses and the Family File alike. J.A. 180. "This court has encountered cases of more miserable upbringing," it continued, "but, praise God, not often." *Id.* at 181.

The existence of "*some* mitigation evidence," true enough, does not "foreclose an inquiry into whether a facially deficient . . . investigation might have prejudiced the defendant." *Sears v. Upton*, 130 S. Ct. 3259, 3266 (2010). But there is no prejudice under *Strickland* when a thorough investigation "would barely have altered the sentencing profile presented" to the jury. *Id.* Esparza can prevail only by pointing to new evidence that "differ[s] in a substantial way—in strength and subject matter—from the evidence actually presented at sentencing." *Hill v. Mitchell*, 400 F.3d 308, 319 (6th Cir. 2005). That simply is not the case here.

Esparza's new evidence consists of eighteen affidavits submitted to the Ohio Court of Common Pleas during state post-conviction review. The first fourteen were prepared by his relatives and friends. From these he derives twenty-eight facts allegedly never presented to the jury. In truth, his counsel did present many of these facts to the jury, including Fact 2 ("There was never any food in the house for the Esparza children") and Facts 3 and 4 (Frank drank heavily and abused his family). And the others embellish themes already found in the trial-court record. Consider, for example, Fact 1 ("There were rats and cockroaches in the house [where] the Esparza children were raised"), Facts 15, 16, 17 and 18 (Esparza's grandparents hated him and refused to raise him in their home), and Fact 21 (Frank would beat Esparza "in the area of his genitals"). None of the facts, whether these or the others, sufficiently differs in degree or kind to meet *Strickland*'s high bar. The same holds true for the facts set forth in the three affidavits from witnesses counsel *did* call: his brother Peter, his aunt Virginia, and his foster father Ralph.

The last affidavit, prepared by independent expert Dr. Julia Hawgood, does not introduce new facts at all. It instead explains "the connection between [Esparza's] childhood experiences" and his crime, an explanation Esparza argues his lawyers never gave. Appellant Br. at 56–57. The record contradicts this claim twice over. Lead counsel Keithley Sparrow made this connection the centerpiece of his closing argument. Sparrow reiterated Esparza's "chaotic and

disruptive childhood, the fact that he was constantly moved from place to place, the removal from his family when he was 7 years old, the death of his mother when he was 8," and the abuse inflicted on him by his father. R. 189-1 at 49. He asked the jury to "[r]ead . . . th[e] family file. Read about Greg Esparza. . . . There is a lot of information for you." *Id.* at 50. And he explicitly refracted Esparza's actions through the lens of "what happened to him at age 7," noting that Esparza "didn't have any control over what was happening to him, and he was removed from a home which, while it wasn't a nurturing home, was a family setting . . . . [W]hen you weigh all of those factors, when you weigh his life, you will determine that mercy requires . . . that your decision be a recommendation of life, not death." *Id.* at 50–51.

The record echoes Hawgood's statements, making it difficult to conclude that this expert testimony could have made a difference. Hawgood observed that Esparza's experiences "formed him into [a] person . . . who covered his vulnerability and sense of inadequacy with a tough, hard-shelled, often callous 'machismo'" characteristic of "Hispanic . . . street subculture[]." J.A. 2180–81. So did the Family File. *See* R. 193-1 at 22 ("[Esparza] portrays himself as a 'tuff guy' who is not going to be pushed around. Perhaps his defiant resentment toward authority . . . has to do with the fact that he has been placed in so many different living conditions in the last five years."); R. 185-1 at 11 ("His behavior and attitude can be directly attributed to his father and the [M]exican concept of 'machismo.'"). Hawgood observed that Esparza lacked positive role models and "long-term, consistent structure and guidance," which intensified his "rebelliousness, his anger, and his hardshell survival tactics." J.A. 2179. So did the Family File. *See* R. 193-1 at 13 ("[Esparza] is in bad need of a very structured, stable environment . . . to learn a better way of . . . ventilating aggression more appropriately."). Hawgood observed that Esparza's behavior took a turn for the worse when he left the Grennays' household, in whose care he had experienced "relative success interpersonally" and "academic[ally]." J.A. 2180. So did the Family File. *See* R. 185-1 at 8 ("[Esparza] seems to be adjusting quite well in this well organized loving family. . . . Hopefully it will continue."). And so indeed did Ralph Grennay's testimony at trial. *See* J.A. 7509–10. Because Hawgood's affidavit added little to the trial court record that was not already there, any omission of this kind of argument and evidence had no cognizable prejudicial effect.

Precedent buttresses this conclusion.  This case is not like *Porter v. McCollum*, 558 U.S. 30, 33 (2009), where counsel's mitigation theory made no reference to Porter's "abusive childhood, his heroic military service . . . , his long-term substance abuse, and his impaired mental health and mental capacity."  Nor is it like *Sears*, where counsel failed to uncover evidence of physical abuse and "significant frontal lobe abnormalities" in the course of his investigation.  130 S. Ct. at 3262.  Nor, contrary to Esparza's claim at oral argument, is it like *Glenn v. Tate*, 71 F.3d 1204 (6th Cir. 1995), a pre-AEDPA case where counsel failed to uncover evidence of organic brain damage.  But it is like *Strickland*.  There, counsel focused on Washington's "extreme emotional distress" and his decision to "accept[] . . . responsibility for his crimes."  466 U.S. at 699.  Subsequent investigation revealed merely that "numerous people" thought Washington "was generally a good person," and that "a psychiatrist and a psychologist believed he was under considerable emotional stress."  *Id.* at 700.  The Supreme Court turned Washington's prejudice argument aside.

Esparza's rejoinders to this conclusion fall short.  Esparza argues that, had his lawyers investigated more thoroughly, they would not have put his grandfather—who allegedly despised him—on the stand.  Appellant Br. at 49.  But he does not clothe this bare assertion of prejudice with evidence from the record.  Nor do we see how he could, given that the new affidavits confirm DeLa Rosa's testimony.

Esparza faults his lawyers for failing to retain an independent psychologist, forcing him to rely on the Center's experts instead.  *See* Reply Br. at 22–23.  But Esparza's lawyers correctly invoked Ohio's indigent-expert statute at trial.  *See* Appellant Br. at 7, 12–13.  Their only mistake was to treat the indigent-expert statute as "intertwined" with Ohio's capital-expert statute (Ohio Rev. Code § 2929.03), which led them to believe that they were entitled to an independent (and not a court-appointed) expert under the latter's terms.  *Esparza*, 529 N.E.2d at 194.  Esparza does not explain how that mistake could have affected the trial court's decision to deny his request under the former.  Nor can he argue that, in denying his request, the trial court acted unreasonably.  *See Miller v. Colson*, 694 F.3d 691, 699 (6th Cir. 2012) (holding that the right to an independent psychiatrist is not a "clearly established federal law" under AEDPA).

Esparza adds that the Ohio Court of Appeals never mentioned Hawgood's affidavit on post-conviction review. Maybe so. But this fact does him no good. AEDPA deference applies even when "the state court's reasoning is flawed or abbreviated." *Holder v. Palmer*, 588 F.3d 328, 341 (6th Cir. 2009).

Because Esparza's new evidence does not differ in "strength" or "subject matter" from the evidence he submitted at trial, we must defer to the Ohio courts' reasonable refusal to find prejudice here. *See Hill*, 400 F.3d at 319.

B.

Esparza separately criticizes trial counsel for seeking a psychological evaluation under Ohio's capital-expert statute. *See* Ohio Rev. Code § 2929.03(D)(1). Court-appointed experts from the Court Diagnostic and Treatment Center conducted the examination, and the statute required Esparza's lawyers to disclose its results to the jury. After reading the report, his lawyers tried—unsuccessfully—to take back their request. *See* R. 188-1 at 4–20. As Esparza sees it, "The prejudice that flowed from the[] report[] is self-evident." Appellant Br. at 62. The Ohio courts, however, reasonably held otherwise.

We begin by observing that the Center's report *reinforces* the mitigation theory his lawyers presented at trial. It emphasizes Esparza's "extremely chaotic and disruptive childhood" and supplies anecdotes that confirm his witnesses' testimony and the information in his Family File. *See* R. 186-1 at 67–68, 71. In many respects, then, the report bolsters his case.

The report, it is true, also contains additional potentially damaging information. The Center's psychologist diagnosed Esparza with antisocial personality disorder, a personality type predisposed to "drug and alcohol abuse," "poor judgment," and "encounters with the law." R. 186-1 at 70. She added that "Esparza was the principal offender" in the "present offense." *Id.* at 71. But Esparza's attempts to show that this other information made a difference in his sentence are not convincing.

*First*, Esparza attacks the Center's report for discussing all seven of Ohio's statutory mitigating factors, *see* Ohio Rev. Code § 2929.04(B), including ones his trial attorneys did not raise. In effect, the report converted the *absence* of mitigation, he says, into the *presence* of

aggravation in contravention of Ohio law. *See* Appellant Br. at 12. But the trial judge cured any potential prejudice by instructing the jury to consider only one aggravating circumstance: the fact that Esparza "committed the offense of Aggravated Murder while committing Aggravated Robbery." R. 189-1 at 81–82. Esparza offers no bases for overcoming the presumption that juries "follow their instructions." *Richardson v. Marsh*, 481 U.S. 200, 211 (1987).

*Second*, Esparza argues that an antisocial personality disorder diagnosis is categorically prejudicial. *See* Reply Br. at 27–30. That is not the case. Ohio state law, for one, recognizes the disorder as a statutory mitigating factor. *See State v. Seiber*, 564 N.E.2d 408, 416 (Ohio 1990). And, for another, we have held—under AEDPA's deferential standard, no less—that the *failure* to introduce evidence of a similar disorder caused prejudice. *Williams v. Anderson*, 460 F.3d 789, 805 (6th Cir. 2006). Although Esparza correctly observes that the diagnosis can harm as much as it helps, its double-edged nature cuts against the categorical rule he espouses.

*Third*, Esparza advances the more modest argument that the antisocial personality disorder diagnosis prejudiced him in this instance, pointing to the featured role the State gave it in its closing statement. *See* Appellant Br. at 58. But the Family File, submitted by his lawyers, is replete with references to the disorder, its symptoms and Esparza's lifelong pattern of antisocial behavior. *See* R. 193-1 at 7, 8, 13, 20. It is difficult to see how the diagnosis could have prejudiced Esparza when his own lawyers placed most of its constituent parts before the jury.

Even if the Family File had said nothing at all on this score, Esparza would face another problem. At trial, his lawyers undercut the report's credibility by impeaching the psychologists responsible for it. The last defense witness, indeed, was Dr. William Seman, who supervised the diagnosis. Through him they established that the Center had conducted only two evaluations before Esparza's, R. 188-1 at 102; that Esparza's evaluation "deviate[d] . . . from the procedure" the Center typically would have used, *id.* at 103; that the diagnosis took only two days from start to finish, *id.* at 104, 110; and that antisocial personality disorder could "often" be treated in the right setting and might even "spontaneous[ly]" enter "remission," *id.* at 115. Dr. Charlene Cassel, the diagnosing psychologist and the prosecution's sole mitigation witness, admitted much the same on cross-examination. R. 189-1 at 33–34, 38–39. Hawgood's affidavit relies on

these very admissions to question whether Esparza suffered from antisocial personality disorder to begin with.  J.A. 2184–85.  So do Esparza's own briefs.  *See* Appellant Br. at 46–48; Reply Br. at 25–27.

Our precedent forecloses Esparza's response: that his lawyers' decision to introduce the Family File was ineffective assistance too.  *See* Appellant Br. at 75.  As the Ohio courts recognized, the File contained his best arguments for mercy.  Without it, he would have been forced to rely on his witnesses' testimony alone.  Having rejected a prejudice claim on nearly identical facts before, *see Keith v. Mitchell*, 455 F.3d 662, 671–72 (6th Cir. 2006), we refuse Esparza's invitation to reconsider that result.

It likewise is no answer to suggest that counsel could have impeached the diagnosis more effectively by calling an expert such as Hawgood.  Appellant Br. at 63.  This is precisely the sort of tactical judgment *Strickland* counsels against second-guessing, *see* 466 U.S. at 689, as the Ohio Supreme Court has repeatedly held.  *E.g.*, *State v. Thompson*, 514 N.E.2d 407, 417 (Ohio 1987) (holding that a lawyer's decision to rely on cross-examination in lieu of an expert is not ineffective assistance).  The Ohio courts reasonably concluded that Esparza's lawyers neutralized any prejudice the diagnosis might have caused.  *See Esparza*, 529 N.E.2d at 196.

*Finally*, Esparza proposes that, had the Center had time to review his full file, it would never have diagnosed him with antisocial personality disorder in the first place.  Maybe so.  But no cognizable prejudice occurred, or at least the state courts could have reasonably so concluded.  We have already explained why such a diagnosis is not categorically prejudicial.  Indeed, there often will be cases where its mitigation value exceeds its harmful effects.  This case illustrates the point: Unlike Hawgood's explanation, an antisocial personality disorder diagnosis potentially helps diminish Esparza's moral responsibility for his actions.  More, even if the diagnosis was prejudicial, there is no guarantee that it would have stayed out of the trial.  For any attempt by defense counsel to introduce psychological evidence would have opened the door to a rebuttal expert from the State.  *Pinholster*, 131 S. Ct. at 1410.  In sum, the Ohio courts did not unreasonably apply established Supreme Court precedent when they determined that Esparza was not prejudiced by the Center's report.

C.

Esparza blames trial counsel for requesting a presentence investigation using the same statute—and under the same terms—as they requested the Center's report. *See* Ohio Rev. Code § 2929.03(D)(1). That investigation set forth his extensive criminal record (juvenile and adult), R. 186-1 at 62–63, his addiction to painkillers, *id.* at 64, and his history of alcohol abuse, *id.* And it described him as "at least a moderate physical threat to the community," *id.* at 65, because his criminal record "ha[d] escalated rapidly both in frequency and [aggressiveness]," *id.* However, Esparza was not prejudiced by the investigation because the Family File had already put each of these factors on full display.

III.

Esparza's denial-of-continuance claim is governed by standards that are well established and difficult to meet. He must show that the trial court's decision embodied an "unreasoning and arbitrary insistence upon expeditiousness in the face of a justifiable request for delay." *Morris v. Slappy*, 461 U.S. 1, 11–12 (1983) (citations omitted). And he must show that the decision "resulted in actual prejudice to his defense." *Franklin v. Bradshaw*, 695 F.3d 439, 453 (6th Cir. 2012) (citations omitted). To prove "actual prejudice," he must prove that a continuance "would have made relevant witnesses available or added something to the defense." *Id.* (citations omitted).

Esparza argues that the trial judge's denial of his continuance request made it impossible for his lawyers to prepare an adequate penalty-phase theory. We have already explained why none of Esparza's eighteen affidavits added anything meaningful to his defense, and why neither the Center's report nor the presentence investigation subtracted anything from his defense. Because Esparza has failed to show prejudice, we hold that the Ohio courts reasonably rejected his denial-of-continuance claim as well.

\*          \*          \*

Today's decision is not necessarily the end of the road for Esparza. Among other things, he has the right to file a clemency application with the governor to reduce his sentence from

death to life in prison.  In light of the many uninvited difficulties in his childhood, this application may be worth a serious look.

## IV.

For these reasons, we affirm.